**HALPER SADEH LLP**
Zachary Halper, Esq.
36 Kingston Run
North Brunswick, NJ 08902
Tel: (212) 763-0060
Fax: (646) 776-2600
Email: zhalper@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT SIVIGNY, | Case No: |
| Plaintiff, | |
| v. | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| MEDIDATA SOLUTIONS, INC., TAREK SHERIF, GLEN DE VRIES, CARLOS DOMINGUEZ, GEORGE MCCULLOCH, NEIL KURTZ, MARIA RIVAS, LEE SHAPIRO, and ROBERT B. TAYLOR, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Robert Sivigny ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

## NATURE OF THE ACTION

1.     This is an action against Medidata Solutions, Inc. ("Medidata" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9,

in connection with the proposed acquisition (the "Proposed Transaction") of Medidata by Dassault Systèmes SE ("Guarantor"), Dassault Systèmes Americas Corp. ("Parent"), and 3DS Acquistion 6 Corp. ("Merger Sub," and together with Guarantor and Parent, "Dassault").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District and/or Defendants conduct business in this District.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff is, and has been at all relevant times hereto, an owner of Medidata common stock.

7.      Defendant Medidata is a global life sciences technology provider. Medidata is incorporated in Delaware and maintains offices in Iselin, New Jersey. Medidata's stock trades on the NASDAQ Global Select Market under the ticker symbol, "MDSO."

8.      Defendant Tarek Sherif ("Sherif") is a co-founder of Medidata and serves as its Chief Executive Officer and Chairman of the Board.

9.      Defendant Glen de Vries ("Vries") is a co-founder of Medidata and serves as its President and as a director.

10.      Defendant Carlos Dominguez ("Domingeuz") is a director of Medidata.

11.      Defendant George McCulloch ("McCulloch") is a director of Medidata.

12.      Defendant Neil Kurtz ("Kurtz") is a director of Medidata.

13.      Defendant Maria Rivas ("Rivas") is a director of Medidata.

14.      Defendant Lee Shapiro ("Shapiro") is a director of Medidata.

15.      Defendant Robert B. Taylor ("Taylor") is a director of Medidata.

16.      Defendants Sherif, Vries, Dominguez, McCulloch, Kurtz, Rivas, Shapiro, and Taylor are collectively referred to herein as the "Individual Defendants."

17.      Defendants Medidata and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.  Background of the Company

18.      Medidata provides cloud-based solutions to the life sciences industry. Medidata's products are meant to improve "the way clinical research is designed, conducted, analyzed, and commercialized." According to Medidata, it is "lead[ing] the digital transformation of life science with the world's most used platform for clinical development, commercial, and real-world data." Medidata, along with its companies, Acorn AI and SHYFT, "serve 1,300 customers and partners worldwide and empower more than 150,000 certified users every day to create hope for millions of patients."

**B.  The Proposed Transaction**

19.     On June 12, 2019, Medidata and Dassault issued a press release announcing they

had signed a definitive agreement for Dassault to acquire Medidata in an all-cash transaction at a

price of $92.25 per share of Medidata. The press release states, in pertinent part:

**Dassault Systèmes and Medidata Solutions To Join Forces To Accelerate the Life Sciences Industry Innovation For Patient-Centric Experience Through End-to-End Collaborative Platform**

- **Medidata Solutions' market-leading clinical cloud solutions are used by 1,300 customers worldwide to develop their therapeutic innovations and clinical operations performance**

- **Scientific modeling, simulation and digital assets of worldwide trials knowledge and know-how combine to accelerate developments in personalized health, for the benefit of the patient**

- **Life Sciences industry will also benefit from the platform effect spanning drug research and discovery, development, clinical testing, manufacturing and commercialization**

June 12, 2019 01:00 AM Eastern Daylight Time

VÉLIZY-VILLACOUBLAY, France & NEW YORK--(BUSINESS WIRE)--
Dassault Systèmes (Euronext Paris: #13065, DSY.PA) and Medidata Solutions,
Inc. (NASDAQ: MDSO), leader of the digital transformation of the Life Sciences
industry for clinical development, commercial, and real-world data intelligence,
today announced the signing of a definitive agreement for Dassault Systèmes to
acquire Medidata in an all-cash transaction at a price of $ 92.25 per share of
Medidata, representing an enterprise value of $5.8 billion. The transaction was
unanimously approved by the Boards of Directors of both companies. Medidata's
fiscal year ended December 31, 2018, and its revenue was $636 million.

With the acquisition of U.S.-based Medidata and its clinical and commercial
solutions, Dassault Systèmes will reinforce its position as a science-based company
by providing the Life Sciences industry with an integrated business experience
platform for an end-to-end approach to research and discovery, development,
clinical testing, manufacturing and commercialization of new therapies and health
technologies.

"Today marks a significant milestone for the Life Sciences industry and the value
of the virtual world to address the complexity of developing personalized medicine
and patient-centric experiences. Multidiscipline scientific innovation and industrial

performance call for a platform approach connecting the dots between people, ideas and data," said Bernard Charlès, Vice Chairman and CEO, Dassault Systèmes. "Medidata's leading position in clinical trials complements our life sciences solutions on the 3DEXPERIENCE collaborative platform. Medidata's recent expansion into real world evidence and analytics coupled with the power of modeling and simulation demonstrates how the virtual world will catalyze the next generation of patient-inclusive therapeutics. We are now well positioned to be the enabler of the Life Sciences industry transformation, illustrating our company's purpose of harmonizing product, nature and life."

Medidata's clinical expertise and cloud-based solutions power the development and commercialization of smarter therapies for 1,300 customers worldwide, including pharmaceutical companies and biotechs, contract research organizations (CROs), and medical centers and sites. Its solutions enable efficiency and improve quality throughout clinical development programs by enhancing decision-making, accelerating processes execution and oversight, minimizing operational risk, reducing costs and adapting trial strategies. Thirteen of the top 15 drugs sold in 2018 were powered by Medidata's technology. Eighteen of the top 25 pharmaceutical companies and nine of the top 10 CROs are all Medidata customers. Founded in 1999, Medidata is headquartered in New York City, with 16 offices across seven countries, notably in the U.S., Japan, Korea, and the U.K., and counts 2,800 employees and contractors.

"Our mission to get the right treatment, to the right patient, at the right time has fueled our 20-year journey of innovation and commitment to the life sciences industry," said Tarek Sherif, Co-founder, Chairman and CEO, Medidata. "We share common vision, values and passion with Dassault Systèmes, and our combined talents will empower the life sciences industry with an end-to-end business platform."

"Facilitating new therapeutic innovations to become the next standards of care has been our commitment since day one," said Glen de Vries, Co-founder and President, Medidata. "Ultimately, we will unlock enormous opportunities for our customers and patients, advancing life sciences in the age of precision medicine."
Since unveiling its purpose of harmonizing product, nature and life in 2012, Dassault Systèmes has been steadily applying its knowledge and know-how for transforming the product sphere, to collaborative, multidisciplinary innovation in the biosphere. Dassault Systèmes collaborates with the world's top 20 biopharma companies, hundreds of biotechnology companies, medical device manufacturers, research institutes, and governmental regulatory agencies to develop and bring to market innovative health products and technologies, using the power of virtual universes to transform the patient experience.

Completion of the acquisition is expected during the last quarter of 2019 and is subject to certain regulatory approvals, approval by the majority of Medidata's shareholders and other customary closing conditions.

20.     On July 19, 2019, Medidata filed a Schedule 14A Definitive Proxy Statement pursuant to Section 14(a) of the Exchange Act (the "Proxy Statement") with the SEC in connection with the Proposed Transaction.

## C.  The Proxy Statement Contains Materially False and Misleading Statements and Omissions

21.     The Proxy Statement, which recommends that Medidata shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) Medidata's financial projections; and (ii) the financial analyses performed by Medidata's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), in connection with its fairness opinion.

22.     The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Reasons for the Merger; Recommendation of the Medidata Board of Directors; (ii) Financial Forecasts; and (iii) Opinion of Morgan Stanley & Co. LLC.

23.     The shareholder vote on the Proposed Transaction is scheduled for August 16, 2019. Unless and until the material misstatements and omissions (referenced below) are remedied, Medidata shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

### 1.  Material Omissions Concerning Medidata's Financial Projections

24.     The Proxy Statement omits material information concerning Medidata's financial projections.

25.     The Proxy Statement states that, "[i]n connection with Medidata's evaluation of the merger, Medidata management prepared non-public financial forecasts as to the potential future performance of Medidata for the fiscal years 2019-2023." These forecasts are referred to in the

Proxy Statement as the "financial forecast." The Proxy Statement provides a "table reflect[ing] selected metrics reflected in, or derived from, the financial forecast." The Proxy Statement also provides a "table reflect[ing] selected metrics reflected in, or derived from, the extrapolated forecast."

26.     The Proxy Statement, however, fails to disclose the following concerning the financial forecast and extrapolated forecast: (1) all line items used to calculate unlevered free cash flow; and (2) a reconciliation of all non-GAAP to GAAP metrics.

27.     When a company discloses non-GAAP financial metrics in a Proxy Statement that was relied upon by its board in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100. The SEC has increased its scrutiny of a company's use of non-GAAP financial measures as such measures can be misleading and "crowd out" more reliable GAAP information.[1]

28.     The disclosure of the aforementioned financial information is material because it would provide Medidata shareholders with a basis to project the future financial performance of

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited July 30, 2019) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

Medidata and would allow shareholders to understand the financial analyses performed by Morgan Stanley in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Medidata and its financial advisor, Medidata shareholders are unable to assess the fairness of the Proposed Transaction and unable to determine how much weight, if any, to place on Morgan Stanley's fairness opinion in determining whether to vote for or against the Proposed Transaction.

29.     Accordingly, in order to cure the materially misleading nature of Medidata's projections, Defendants must provide a reconciliation table of the aforementioned non-GAAP metrics to their most comparable GAAP metrics, and disclose the line item projections. Such projections are necessary to make the non-GAAP projections included in the Proxy Statement not misleading.

30.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Medidata shareholders.

**2.  Material Omissions Concerning Morgan Stanley's Financial Analyses**

31.     In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by the Company's financial advisor, Morgan Stanley.

32.     The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Discounted Cash Flow Analysis*": (1) all line items used to calculate unlevered free cash flows; (2) the range of terminal values for Medidata; and (3) the individual inputs and assumptions underlying (i) the range of discount rates from 8.9% to 9.9%, and (ii) the perpetual growth rate ranging from 2.0% to 4.0%.

33.     The Proxy Statement fails to disclose the following concerning Morgan Stanley's

8

"*Discounted Equity Value Analysis*": (1) the individual inputs and assumptions underlying the application of the revenue multiple range of 5.0x to 7.0x; and (2) the underlying basis for applying the discount rate of 9.5%.

34.     The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Illustrative Leveraged Buyout Analysis*" for Medidata: the basis for selecting the leverageable EBITDAO, leverage multiple, financing terms, exit multiple, and target internal rate of return used in the analysis.

35.     The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Equity Research Analysts' Price Target Analysis*": (1) the price targets for Medidata common stock and the sources thereof; and (2) the individual inputs and assumptions underlying the discount rate of 9.5%.

36.     The valuation methods, underlying assumptions, and key inputs used by Morgan Stanley in rendering its purported fairness opinion must be fairly disclosed to Medidata shareholders. The description of Morgan Stanley's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, Medidata shareholders are unable to fully understand Morgan Stanley's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on it in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Medidata shareholders.

## COUNT I
**For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder**
**Against All Defendants**

37.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

38.     During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

39.     Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

40.     The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

41.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

42.     Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

<u>COUNT II</u>
**Violations of Section 20(a) of the Exchange Act**
<u>Against the Individual Defendants</u>

43.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

44.     The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

45.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

46.     In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

47.     In addition, as the Proxy Statement sets forth at length, and as described herein, the

Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

48.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

49.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B.     In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D.     Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Granting such other and further relief as the Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: July 30, 2019                            Respectfully submitted,

**HALPER SADEH LLP**

/s/Zachary Halper_____
Zachary Halper, Esq.
36 Kingston Run
North Brunswick, NJ 08902
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: zhalper@halpersadeh.com

Daniel Sadeh, Esq. (*pro hac vice* application
forthcoming)
375 Park Avenue, Suite 2607
New York, NY 10152
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*